**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **STEVE LOCKHART,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
|     **vs.** | )    **Case number 4:10cv2434 TCM** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
|     **Defendant.** | ) |

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the application of Steve Lockhart (Plaintiff) for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b.[1] Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

### Procedural History

Plaintiff applied for DIB and SSI in May 2007, alleging he was disabled as of April 26, 2005, by degenerative joint disease, arthritis in his spine, osteoarthritis, dizziness, vision problems, and nervousness.  (R.[2] at 96-98, 105-06.)  His applications were denied initially and after a hearing held in March 2009 before Administrative Law Judge (ALJ) James B.

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

Griffith.  (Id. at 4-7, 15-40.)  The Appeals Council then denied Plaintiff's request for review,
thereby effectively adopting the ALJ's decision as the final decision of the Commissioner.
(Id. at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Brenda G. Young, M.A., testified at the
administrative hearing.

Plaintiff was 51 years old at the time of the hearing, was single, and lived with his
mother.  (Id. at 19-20.)  He did not have any children.  (Id. at 20.)  He had completed the
eleventh grade and had never taken the General Equivalency Degree (GED) exam.  (Id.)  He
last had a valid driver's license in 1975.  (Id.)  He last worked in 2002, for a temporary
employment service, and did not recall working in 2007.  (Id. at 20-21.)  His longest period
of employment was nine months.  (Id. at 21.)

Plaintiff explained that he is unable to work because of "a bad disc in [his] lower
back" that rubs against his nerves and causes pain in his right hip and leg and because of
degenerative arthritis from the left side of his neck to his arm and in his joints, hands, and
feet.  (Id. at 21-22.)  His worst pain in his right leg.  (Id. at 22.)  He has had right leg pain
since 2008.  (Id. at 29.)  He uses a cane because he can neither stand too long nor walk too
far.  (Id. at 22.)  The longest he can stand is for five minutes; the farthest he can walk without
the cane is three blocks and with the cane is five blocks.  (Id. at 22-23.)  After that, he has
to stop and sit down.  (Id. at 23.)  Also, the way he lies and climbing stairs causes pain.  (Id.
at 23-24.)  He takes Naproxen and Motrin to help relieve the pain.  (Id. at 24.)

- 2 -

He constantly has lower back pain and has had back pain since 2005.  (Id. at 24, 29.)
He has a "stiffening pain" in the base of his neck "[q]uite often," e.g., three or four times a
day.  (Id. at 25.)  This pain is aggravated by walking or bending over.  (Id. at 26.)  When he
tries to lift something heavy, e.g., a mop bucket, he has pain from his neck to his left arm.
(Id.)  He has arm pain every day.  (Id. at 27.)  Nothing relieves the neck pain, which he has
had since 2005.  (Id. at 27, 29.)

The heaviest item Plaintiff can lift and carry is a grocery bag weighing three or four
pounds.  (Id.)  His sister goes to the store and he takes the bags from her when she returns.
(Id.)  He tries to clean the bathroom, but it takes awhile.  (Id.)  He does not do any cooking
or wash; he does fold the laundry.  (Id. at 28.)  He sleeps on the couch.  (Id.)  He tries not to
dust or vacuum.  (Id.)  He used to go to church, but has not since he's been at home.  (Id.)
He does not go to visit friends or relatives; relatives visit him approximately once a week.
(Id. at 29.)

Plaintiff was released from prison in April 2009 and has not seen any doctors since.
(Id. at 22, 25.)

Ms. Young testified as a vocational expert (VE).

The ALJ asked her to assume a hypothetical claimant who (a) was unskilled; (b) able
to lift and carry up to twenty pounds occasionally and ten pounds frequently; (c) could stand,
sit, and walk for a total of six hours out of eight with normal breaks; and (d) could only
occasionally reach overhead, climb, and use ramps or stairs.  (Id. at 31.)  With these
limitations, Plaintiff's past work as a temporary machine operator or as a janitor would still

be possible.  (Id.)  With these same limitations, and Plaintiff's age, education, and work experience, a claimant could perform light janitorial work and small product assembly jobs, significant numbers of which existed in the local economy.  (Id. at 32.)  This finding was consistent with the Dictionary of Occupational Titles.  (Id.)  If this claimant had to use a cane, light work would be eliminated.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from health care providers, and assessments of his physical and mental residual functional capacities.

When applying for DIB and SSI, Plaintiff completed a Disability Report.  (Id. at 111-18.)  Degenerative joint disease, spinal arthritis, osteoarthritis, vision problems, and nervousness limited his ability to work.  (Id. at 112.)  Specifically, he was stiff, had problems moving, was in constant joint pain, had problems with his joints locking up and making it difficult for him to lift things, had severe pain in his back and neck, had dizzy spells, was nervous, and had the shakes.  (Id.)  His impairments first interfered with his ability to work in 2003 and stopped him from working on April 26, 2005.  (Id.)  He had stopped working on January 31, 2003, when he was fired for dropping things when working on an assembly line.  (Id.)  His longest-held job was as a janitor.  (Id. at 113.)  He had completed the eleventh grade, and had not been in special education classes.  (Id. at 117.)

- 4 -

Plaintiff also completed a Function Report.  (Id. at 136-43.)  He lives in a house with his mother.  (Id. at 136.)  During the day, he eats, takes a shower, and watches television. (Id.)  Before his impairments, he could use his hands, hold a job, stoop, and bend.  (Id. at 137.)  His impairments do not affect his ability to take care of personal grooming.  (Id.) His neck and back pain do make it hard for him to sleep.  (Id.)  He sometimes needs to be reminded to take his medication.  (Id. at 138.)  His mother cooks for him.  (Id.)  He mows the lawn and does the laundry.  (Id.)  This takes him two hours once a week.  (Id.)  Once or twice a week, for approximately an hour, he shops for personal items, e.g., cigarettes, soap, toothpaste.  (Id. at 139.)  His interests are reading and watching television.  (Id. at 140.)  He does not have any problems getting along with other people.  (Id. at 141.)  His impairments affect his abilities to lift, squat, bend, walk, kneel, complete tasks, and use his hands.  (Id.) They do not affect his abilities to sit, reach, stand, see, climb stairs, remember, concentrate, follow instructions, or get along with others.  (Id.)  He can walk twenty to thirty minutes before getting tired and having to stop; he can lift thirty to fifty pounds.  (Id.)  He does not follow written instructions, get along with authority figures, or handle stress well.  (Id. at 141-42.)  He wears glasses, and has since 1975.  (Id. at 142.)  He does not use a cane.  (Id.)

The same day, Plaintiff's sister completed a Function Report on his behalf.  (Id. at 119-27.)  She sees him approximately three times a week.  (Id. at 119.)  He lives in a house with family.  (Id.)  She does not know what he does during the day other than cleaning the house and doing laundry.  (Id.)  His neck and back pain affect his sleep.  (Id. at 120.)  She does not know if his impairments affect his ability to take care of personal grooming tasks.  (Id.)  He

does not need any reminders to take care of his personal needs and grooming or to take his medication.  (Id. at 121.)  She does not know if he prepared his own meals.  (Id.)  He mows the grass and does the laundry; she does not know how long these tasks take him.  (Id.)  She does not know if he goes outside, but does know that he goes to the store to shop for personal items.  (Id. at 122.)   His interests include reading and watching sports on television.  (Id. at 123.)  He does not spend any time with others.  (Id.)  He goes to church twice a month.  (Id.)  He has no problems getting along with people, although he usually does not feel well enough to engage in social activities, or in paying attention.  (Id. at 123-24.)  His impairments, specifically, his joint pain, affect his abilities to lift, climb stairs, squat, bend, use his hand, walk, and complete tasks.  (Id. at 124.)  They do not affect his abilities to sit, reach, stand, see, understand, concentrate, remember, follow instructions, or get along with others.  (Id.)  He does not handle stress well.  (Id.)  He wears glasses.  (Id. at 125.)  He does not use a cane.  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his applications.  (Id. at 147-53.)  There had been no change in his impairments since he had completed the initial report.  (Id. at 148.)  Since that time, he had been to Christian Hospital Northeast for his back and neck pain and had been prescribed hydrocodone and Naproxen.  (Id. at 148-50.)  He could not work, exercise, do yard work, or get out much.  (Id. at 151.)

Also before the ALJ was Plaintiff's earnings record for 1974 to 2007, inclusive.  (Id. at 100.)  His greatest annual earnings were $2,153.49, in 1995; his next greatest were $1,194.25, in 1993.  (Id.)  He had no earning in 2003, 2004, 2005, and 2006.  (Id.)  His

earnings in 2007 were $168.00.  (Id.)  In twenty of the thirty-two, he had no earnings at all.
(Id.)

Plaintiff's medical records were either from the Missouri Department of Corrections
(DOC) or Christian Hospital Northeast (Christian Hospital).

At an appointment in July 2004 with a DOC health care provider, Plaintiff reported
that he had abused alcohol since he was fifteen and would occasionally drink until he passed
out.  (Id. at 158.)  He had also intermittently used crack cocaine and heroin for ten years.
(Id.)  The heroin use had stopped approximately ten years earlier; the alcohol and crack
cocaine use had stopped one year earlier.  (Id.)  His Global Assessment of Functioning (GAF)
was 60.[3]  (Id.)  He was to be released in December 2005.  (See Id. at 167.)

In March 2006, Plaintiff had returned to the DOC.  (See Id. at 168.)  He reported
having no medical problems the DOC needed to know about.  (Id. at 169.)  When having a
physical examination that month, Plaintiff was not using a cane and denied any joint pain or
vision problems.  (Id. at 163.)  In May, Plaintiff had an intake mental health evaluation.  (Id.
at 161-62.)  He did not show signs of serious depression, acute psychosis, or active mania.
(Id. at 161.)  He had quit using alcohol and heroin in August 2003.  (Id.)  His GAF was 70.[4]

---

[3]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used
to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v.
Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100
to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between
51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional
panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends,
conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

[4]See note 3, supra.

(Id. at 162.)  In June, Plaintiff consulted a DOC doctor about gas.  (Id. at 178.)  The doctor noted that Plaintiff's "old record" showed multiple doctor appointments for various complaints and "no-shows [were] not uncommon."  (Id.)

Plaintiff went to the emergency room at Christian Hospital in April 2007 with complaints of neck and right arm pain and a report of a diagnosis of cervical arthritis ten years earlier.  (Id. at  183-208.)  The pain was a seven on a ten-point scale, with ten being the worst, and was worse when he lay down.  (Id. at 185, 187, 189.)  He was not currently taking any medications.  (Id. at 183.)  He had a positive response to an injection of Toradol.  (Id. at 187-88.)  He had no back pain, and had had no prior treatment for the neck pain.  (Id. at 190.)  An x-ray of his cervical spine revealed a slight straightening of his cervical lordosis; a moderately severe disc space narrowing at C5-6 and a mild narrowing at C4-5 and possibly at C6-7; degenerative changes at the opposing vertebral and plates at C5-6; large anterior osteophytes at C5 and C6; small anterior osteophyte inferior margin at C4 and superior margin of C7; and mild right-sided foraminal stenosis at C5-6.  (Id. at 192-94, 206.)  The diagnosis was degenerative disc disease with degenerative spurring and probable mild right foraminal stenosis at C5-6 and uncovertebral joint spurs on the left side.  (Id. at 193, 194, 206.)  Plaintiff was discharged home with a prescription for Vicodin and Anaprox.  (Id. at 195.)

When seen by a DOC doctor in July 2008, Plaintiff reported right hip pain and was prescribed Naproxen.  (Id. at 235.)  Two days later, a nurse gave him a lay-in[5] for three months due to his arthritis and right hip pain.  (Id. at 237.)  An x-ray of his right hip taken five days later was negative for any bony injury.  (Id. at 239.)  The joint spaces were preserved; the cortical margins and articular surfaces were smooth.  (Id.)  He returned four days later, and reported to a nurse that his cellmate thought he had a pinched nerve.  (Id. at 241.)  He was walking bent forward and was to be referred to a doctor.  (Id.)  Two weeks later, a nurse noted that Plaintiff would benefit from use of a cane.  (Id. at 242.)  He was walking with an abnormal gait and was to be assigned to a bottom bunk.  (Id.)  He was to be referred to a doctor for a lay-in.  (Id.)

Also before the ALJ were assessments of Plaintiff's mental functional capacities by an examining consulting psychologist and by a non-examining consultant and an assessment of his physical residual functional capacity by non-examining agency consultant.

L. Lynn Mades, Ph.D., a licensed psychologist, performed a psychological evaluation of Plaintiff in June 2007.  (Id. at 209-13.)  Plaintiff complained of arthritis and getting dizzy sometimes when he stood up.  (Id. at 209.)  He reported that he had "'nervous problems,'" i.e., "his nerves got bad" and he itched.  (Id.)  These problems were not related to anxiety but to "some type of nerve damage."  (Id.)  He did not have any mood problems.  (Id.)  He last drank alcohol three or four weeks earlier; he had then drunk twelve beers and a pint or more

---

[5]A lay-in "allows a prisoner to stay in bed except for meals."  **Popoalii v. Correctional Med. Servs.**, 512 F.3d 488, 492 (8th Cir. 2008).

of vodka.  (Id. at 210.)  He drank on the weekends, and usually drank that amount.  (Id.)  He did not have the "shakes," but did have blackouts.  (Id.)  He last used crack cocaine four or five years ago and heroin six years ago.  (Id.)  He had "history of special education placement for behavior problems in school" and had been suspended three or four times.  (Id.)  His longest period of employment was thirty days.  (Id.)  He either would quit a job or be fired because of physical complaints.  (Id.)  He had been arrested multiple times; had been in the penitentiary several times; was last released in 2006; and was on parole until next year.  (Id. at 210-11.)  His hygiene was within normal limits; his attitude was "generally cooperative and pleasant"; his expression was alert; and, his eye contact was good.  (Id. at 211.)  His posture and gait were within normal limits.  (Id.)  His speech was normal in rate and rhythm and was without tangents, flight of ideas, or perseveration.  (Id.)  His affect was full and appropriate.  (Id.)  His thought contact was without disturbance.  (Id.)  He was oriented in all spheres and could repeat five digits forward.  (Id.)  He could not name the current president, governor, or mayor.  (Id.)  He could name four past presidents.  (Id. at 212.) His expressed verbal judgment was poor to fair, e.g., if he discovered a fire in a crowded theater, he would get out; his proverb interpretation was poor; his insight and judgment were slightly limited.  (Id.)  He could perform simple calculations and had a fair ability to assess essential shared characteristics between objects.  (Id.)  He had an adequate ability to maintain attention and concentration with appropriate persistence and pace.  (Id.)  His diagnosis was alcohol

- 10 -

abuse and opioid abuse and cocaine abuse in sustained full remission according to Plaintiff. (Id. at 212-13.)  He had a GAF of 80[6] and a fair prognosis.  (Id. at 213.)

The following month, Michael Stacy, Ph.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff.  (Id. at 215–25.)  Plaintiff was described as having a personality disorder, i.e., an antisocial personality disorder, and substance abuse disorder, neither of which were severe.  (Id. at 215, 220, 221.)  His two disorders resulted in mild difficulties in maintaining social functioning, in no restrictions of activities of daily living, and in no difficulties in maintaining concentration, persistence, or pace.  (Id. at 223.)  Nor were there any episodes of decompensation of extended duration.  (Id.)

The same month, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by an agency nonmedical consultant.  (Id. at 226-31.)  The only diagnosis was degenerative disc disease of the cervical spine.  (Id. at 226.)  This impairment resulted in exertional limitations of Plaintiff being able to occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; and stand, walk, or sit about six hours in an eight-hour day.  (Id. at 227.)  His ability to push or pull was limited in his upper extremities.  (Id.)  He had postural limitations of only occasionally climbing ramps, stairs, ladders, ropes, or scaffolds.  (Id. at 229.)  He had a manipulative limitation in his ability to reach in all directions, including overhead.  (Id.)  He had no visual, communicative, or environmental limitations.  (Id. at 229-30.)

---

[6]A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ." DSM-IV-TR at 34.

### The ALJ's Decision

Employing the Commissioner's sequential evaluation process, see pages 13 to 16, below, the ALJ first found that Plaintiff had not engaged in substantial gainful activity after April 26, 2007, the application date.  (Id. at 9.)  Indeed, Plaintiff had never been engaged in substantial gainful activity and had no past relevant work.  (Id.)  The ALJ next found that Plaintiff has severe impairments of degenerative disc disease of the cervical spine and osteoarthritis.  (Id.)  He found "no evidence of a severe mental impairment."  (Id. at 10.)  Nor did he have an impairment or combination thereof that met or medically equaled an impairment of listing-level severity.  (Id.)

The ALJ then concluded that Plaintiff had the residual functional capacity (RFC) to perform light work[7] with the additional restrictions of being limited to only occasional reaching overhead and climbing of ladders, ropes, scaffolds, ramps, and stairs.  (Id.)  In reaching this conclusion, the ALJ found that Plaintiff's limited daily activities were not due solely to his medical condition, that no treating or examining physician had ever found him disabled or limited in certain activities, that he had a poor work history and low earnings, and that an award of SSI would result in more annual income than he had ever earned.  (Id. at 11-12.)

---

[7]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

Given this RFC and Plaintiff's age, education, and work experience, he could perform such jobs as janitor and production/assembly worker.  (Id. at 12.)  He was not, therefore, disabled within the meaning of the Act.[8]  (Id. at 13.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b),

_____

[8]The ALJ's decision refers only to Plaintiff's SSI application.  To be eligible for DIB, Plaintiff had to show a he had earned sufficient wages in the past five years to qualify.  See 42 U.S.C. § 423(d); 20 C.F.R. § 404.130.  Plaintiff clearly did not qualify; therefore, the ALJ's failure to also refer to his DIB application was not prejudicial.

416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.  Accord **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006). Conversely, "[a]n impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's ability to work . . . ."  **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007).  "Severity is not an onerous requirement . . . , but it is also not a toothless standard . . . ."  **Id.** at 708 (internal citations omitted).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."

- 14 -

**Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'"   **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).   "'The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  [A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"   **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

"'Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility.'"   **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'"   **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524).   After considering these factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.

**Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If, [however,] after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred by (1) not offering sufficient reasons to support his conclusion that the need for a cane and lay-in were based on his subjective complaints because these DOC accommodations were significant nonexertional limitations and (2) not including his need for a cane in the hypothetical question posed to the VE.

Plaintiff notes that he was given a lay-in, a bottom bunk, and a cane in 2008 and argues that these accommodations reflect restrictions which should have been incorporated in his RFC. As noted by the Commissioner, however, these accommodations were made by a nurse in response to Plaintiff complaining of right hip pain and walking bent forward, to Plaintiff's report that he had been told by his cellmate that his pain was caused by a pinched nerve, and after an x-ray showed nothing wrong with the hip. A nurse is not "an acceptable medical source," see 20 C.F.R. §§ 404.1513(a), 416.913(a), and consequently cannot provide medical opinions or be considered a treating source, see 20 C.F.R. §§ 404.1527(a)(2), 404,1527(d), 416.927(a)(2), and 416.927(d). Moreover, the records reflect that Plaintiff was to be referred to a doctor, an acceptable medical source, but do not include any record of any such visit. Clearly, the accommodations made by the nurse were based on Plaintiff's description of his pain and in anticipation of him being seen by a doctor.

As noted above, when assessing a claimant's RFC, ALJ must evaluate his credibility. Thus, although not directly challenged by Plaintiff, the ALJ's assessment of his credibility is integral to his RFC conclusions. As set forth below, that assessment is supported by substantial evidence on the record as a whole.

When evaluating a claimant's subjective complaints, an ALJ may properly consider whether those complaints are supported by the objective medical evidence, although a lack of such support may not be the only reason for discounting his complaints. **Halverson v. Astrue**, 600 F.3d 922, 931-32 (8th Cir. 2010). "'A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms.'" **Martise**, 641 F.3d at 923 (quoting 20 C.F.R. § 404.1508) (alteration in original). See also 42 U.S.C. § 423(d)(5)(A) (requiring that a claimant's complaints of pain or symptoms not be conclusive evidence of disability but there also be "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques"). Pain is a symptom, not an impairment. See 20 C.F.R. §§ 404.1569a(a), 416.969a(a). As explained below, the ALJ did not err in finding Plaintiff's allegations of disabling pain not to be credible.

First, although the lack of objective medical evidence supporting Plaintiff's subjective complaints may not be the sole basis for rejecting those complaints, it is a proper consideration. See **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005).

Second, "'[an] ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole.'" **McCoy v. Astrue**, 648 F.3d 605, 614 (8th Cir. 2011) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004)). The record before the ALJ was replete with inconsistencies. For instance, Plaintiff alleged a disability onset date of April 2005, but had stopped working in January 2003. He reported that he could hold a job before

his impairments, but the earliest onset date of a cited impairment is two years after his last job.  He reported that he needed to be reminded to take his medication; his sister reported that he did not.  He reported that he used to go to church before his impairments; his sister reported that he went twice a month.  He reported that he had not been in special education classes, but told the consulting psychologist that he had been.  He testified that he could not stand for longer than five minutes, yet he and his sister both reported that his impairments did not affect his ability to stand.  He testified that he had had neck pain since 2005, yet told the health care providers at Christian Hospital that he had had no prior treatment.  And, there are no records of any treatment of any alleged impairment until that visit.  He testified he had disabling back pain since 2005; however, when at the emergency room in 2007 he had no symptoms of such.   Third, Plaintiff's poor work history detracts from his credibility.  <u>See</u> **Wildman v. Astrue**, 596 F.3d 959, 968-69 (8th Cir. 2010) (ALJ properly considered claimant's sporadic work history prior to her alleged onset date as detracting from her credibility); <u>accord</u> **Bradley v. Astrue**, 528 F.3d 1113, 1115 (8th Cir. 2008).  Moreover, the Court notes that he sought medical treatment from the DOC in connection with a lay-in excusing him from work.

Fourth, no *doctor* has placed any restriction on Plaintiff because of any alleged impairment.  <u>See</u> **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008) (finding that lack of physician-imposed restriction was inconsistent with claimant's report of debilitating symptoms).  <u>See</u> <u>also</u> **Forte v. Barnhart**, 377 F.3d 892, 896 (8th Cir. 2006) (finding that ALJ

- 20 -

had not erred in not considering alleged impairment in assessing claimant's RFC when no doctor had imposed any restrictions on claimant due to impairment).

Plaintiff further argues that the ALJ erred by not including his need for a cane in the hypothetical question posed to the VE.   A properly phrased hypothetical question to a VE must "capture the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997); accord **Robson v. Astrue**, 526 F.3d389, 392 (8th Cir. 2008). "A hypothetical question is properly formulated[, however,] if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).  Accord **Goff**, 421 F.3d at 794; **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999).  Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question. **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001).  Because the ALJ did not err in not finding that Plaintiff needed to use a cane, he did not err in excluding the use in his hypothetical questions to the VE.

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of November, 2011.

- 22 -